**Perdita M. SCHAFFNER, Beneficiary of Trust under Bryher Agreement, Plaintiff,**

**v.**

**CHEMICAL BANK, Defendant.**

**No. 70 Civ. 5323.**

United States District Court, S. D. New York.

March 10, 1972.

Pomerantz, Levy, Haudek & Block, New York City, for plaintiff by Abraham L. Pomerantz, New York City, of counsel.

Cravath, Swaine & Moore, New York City, for defendant; by Ralph L. McAfee, and White & Case, V. Thomas Fryman, Jr., New York City, of counsel.

## OPINION

POLLACK, District Judge.

Plaintiff, an income beneficiary of a personal *inter vivos* trust of which defendant bank is the trustee, seeks to maintain this suit as a class action under F.R.Civ.P. 23(b) (3). The complaint asserts that the class consists of all persons and institutions who are or have been beneficiaries of any trust or trusts of which defendant is trustee and for whose account defendant executes securities transactions.

Apparently, the defendant administers approximately five thousand trusts either as sole trustee or with others as co-trustee. The number of beneficiaries of these trusts, whether present, future, vested, contingent, or income beneficiaries, or remaindermen, includes many thousands of persons, known and unknown. The trusts for whose account defendant executes or may execute securities transactions involve personal, professional, institutional, *inter vivos* and testamentary trusts and possibly other types.

The plaintiff seeks to represent not only the beneficiaries of the trust in which plaintiff is interested, but also the beneficiaries of trusts in which she has no interest. Accordingly, the plaintiff has moved for a determination pursuant to F.R.Civ.P. 23(c) (1) that this action is to be maintained as a class action. The defendant opposes the motion on the ground that plaintiff has not satisfied the requirements of Rule 23(b) (3); that the federal claims asserted in the complaint lack any merit and do not justify the burden of maintaining a class action in a federal court; and that the plaintiff's claim is not typical of any claim of the class, as required by paragraph (a) (3) of Rule 23.

*The Complaint*

The complaint alleges five separate counts; three are based on federal statutes—the Sherman Act, the Securities Exchange Act and the Federal Reserve Act—and two are based on state law claims for breach of fiduciary obligations.

The first count asserts that a substantial portion of defendant's business consists of maintaining trust accounts for

the benefit of institutional and individual beneficiaries such as plaintiff; that in 1968 the trusts administered by defendant contained more than four and a half billion dollars worth of assets, or more than five percent of the trust funds administered in New York State. In the course of maintaining and administering such trust accounts defendant from time to time purchases and sells securities constituting the corpus of the trust or trusts. And in the course of such transactions defendant retains the services of securities broker-dealers who charge commissions for their services. These broker-dealers keep substantial amounts of money on deposit with banks and additionally they borrow substantial amounts of money from banks. This banking business represents a valuable portion of the revenue-producing business of banks, such as defendant.

The complaint further alleges that since 1938 and before, defendant has entered into understandings with unknown broker-dealers for "reciprocal business" by which the defendant agrees to allocate the securities transactions of its beneficiaries to broker-dealers to the extent that they place their banking business with the defendant; and that this really amounts to mutual "back-scratching", in violation of the duties asserted in the complaint to have been breached.

The purpose and effect of the alleged reciprocity engaged in are charged as restraints on interstate trade or commerce. The complaint asserts that trust beneficiaries have been damaged [1] by ignored opportunities to secure portfolio advice available from brokers not favored with defendant's orders, by ignored opportunities to secure better executions on transactions; that reciprocal business considerations have induced churn over of trust accounts; and that

defendant has made inadequate use of the "third market" to save money for the trusts on executions.

Consequently, says plaintiff, defendant has, for the sake of its own profit, cut off plaintiff and other beneficiaries from their market in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, to their damage in the amount of value lost to the trust portfolios and the amount of profit gained by the defendant.

The second claim restates the allegations of the first and adds that defendant held itself out to the plaintiff, her settlor and her class as an expert trustee. However, according to the complaint, defendant fraudulently omitted to mention that it would be influenced by its self interest in exacting reciprocal business; that, in choosing broker-dealers for the portfolio transactions, the defendant would be unduly influenced by its self interest in exacting reciprocal business to the possible detriment of good portfolio investment advice; and that the defendant would make inadequate use of the "third market" even though that market might be advantageous to the trust.

This count asserts that it was necessary to state these matters just mentioned in order to make the matters which were in fact stated not false and misleading and that the omissions were material.

The foregoing is posed as a violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated by the Securities and Exchange Commission under that Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b–5.

The third count restates all of the foregoing and asserts in addition that a federal statute prohibits any member bank from paying any interest on any

---

[1]. Although there has been no amendment to the complaint or signed stipulation of the parties, the plaintiff's attorney in a reply states that he expressly disclaims "damages" due to churning, third market avoidance, faulty execution and inadequate research. "These . . . [he says] are not viewed herein as separate grounds of liability;" "These are symptoms of the disease of reciprocity." Presumably, plaintiff will seek on trial to prove these "symptoms".

deposit which is payable on demand. 12 U.S.C. § 371a. The complaint asserts further that virtually all of the deposits that the defendant has acquired from broker-dealers are payable on demand and in allocating its portfolio business on a reciprocal basis the defendant has been utilizing a device to pay interest on demand deposits in violation of that statute and has been passing on the interest payment as a charge to its trust beneficiaries.

This count asserts that by reason of the passing on of the illegal interest payments as charges, plaintiff, and her class, have been damaged in the amount of all such charges and the loss of portfolio value through such payments, and in the amount of the profits which the defendant has gained through such illegal payments at plaintiff's expense. The plaintiff's alleged damages, exclusive of interest and costs, are alleged to exceed the sum of $10,000.00.

The fourth claim reiterates all of the foregoing paragraphs of the complaint and asserts that defendant held itself out as a professional trustee and assumed a position of highest trust and confidence and nonetheless falsely and fraudulently represented and warranted to the plaintiff and other beneficiaries that its profit in connection with administering the trusts would be limited to the charges set forth in its agreement or otherwise as provided by law whereas the defendant knew it was going to make other and further profits through the reciprocal business arrangements. The plaintiff seeks an accounting of these alleged secret profits.

The fifth count restates and reiterates all of the foregoing portions of the complaint and asserts additionally that defendant was under a fiduciary duty to preserve the assets of the trusts and not to apply the proceeds of any administrative expenses of the trusts to its own account. This count asserts that by reason of the waste and conversion expressed, the defendant is liable to restore to the trust for the benefit of the plaintiff and the members of her class the value of all items wasted or converted.

The prayer for relief is for an injunction restraining defendant from reciprocal business practices in connection with trust portfolio transactions and requiring the defendant to pay the plaintiff and the class the amount of damages they incurred or in the alternative to apply such damages to the corpus of the trust. Demand is made that by reason of antitrust violations these damages be trebled and further that an award be made of counsel and accounting fees.

Plaintiff's papers say that the interest of any individual trust beneficiary is one of indeterminate value, and may be quite small, and that it would undoubtedly be uneconomic for each trust beneficiary to pursue his or her separate remedy. Plaintiff admits that it would be quite conjectural to attempt to prove that the commission on any given transaction brought defendant specific business from an individual broker. Consequently, the plaintiff charges that it is the system that is at fault and only a class action can adequately attack the system.

It may be useful to examine the nature of the plaintiff's beneficial interests in the trust in which she is directly involved. Plaintiff is the adopted child of the settlors of the trust created in 1938 which names the adoptive mother as the income beneficiary, the plaintiff and the adoptive father as contingent secondary income beneficiaries with powers of appointment, and plaintiff, among others, as a contingent remainderman. Since the creation of this trust, plaintiff has partially renounced her power of appointment, received an assignment of one-half of the income interest of her adoptive parent, received intermediate accountings and released and discharged defendant from all manner of responsibility and liability as to all transactions embraced in the accounts through December 31, 1948; and plaintiff's income assignor settled defendant's account and released it through July 15, 1958, and discharged

defendant from any and every claim in respect of the trust and the administration thereof to that date.

The record submitted in opposition to the plaintiff's motion details much of the administration of the trust and belies the plaintiff's thesis and at the same time shows matters clearly antithetical to the claims on behalf of a class.

The record clearly demonstrates that so far as the plaintiff's trust is concerned there was no reciprocal business involved. The brokers employed to conduct securities transactions were specifically designated by the settlors and the bank followed their instructions in this regard.

In a letter to defendant dated January 28, 1941, the attorney representative of the settlors expressly requested that defendant use particular brokers for transactions for the trusts which had been created, including the trust in which the plaintiff is interested as a beneficiary; he said:

> Mr. Kenneth MacPherson has asked me to request the Bank, to use, insofar as it may be possible, brokers of his own selection in securities transactions.
>
> He requests that until further notice, if you can so arrange, you place half of your orders for purchases and sales in accounts having to do with his wife or himself (both custodian and trust accounts) with J. S. Bache & Co., attention of Mr. Radcliffe Swinnerton, and half with Francis I. duPont & Co., attention of Mr. Edward D. Untermyer.

The Bank acted accordingly and, when Mr. Untermyer departed from duPont, the attorney representative of the creators suggested that all securities transactions be directed to Mr. Swinnerton, the second of the two previously designated by them. This request was complied with. About four years later, in 1950, the defendant was instructed to

clear security transactions for the trust through one Charles Rendigs, of Bache & Co. The settlors' representative added, "I understand that you should be free to trade elsewhere in situations where a double commission is to be avoided or where Bache & Co. cannot match a price". Securities orders were directed accordingly by the Bank. Dividends or rights offerings involving fractional share buy or sell orders were placed through other brokerage firms.[2] Transactions in federal government bonds and state and municipal bonds were generally executed directly with dealers in such bonds.

In each instance of a security transaction the defendant sent a confirmation identifying the broker.

The inferences to be drawn from the record before the Court are that each personal trust for which the defendant serves as a trustee is a separate trust, created by a separate instrument and frequently involving one or more additional instruments amending or modifying the original instrument. Each separate trust is subject to specific and special instructions of the creator or beneficiary. Moreover, the income and remainder interests created by such instruments are unique and may be complex. Such instruments also contain different provisions with respect to matters such as the types of investments authorized for the trust assets, responsibility for making investment changes, and liability of the trustee.

The administration of the instant trust illustrates specific instructions in respect of securities transactions and accountings which defendant has rendered and the instruments of receipt and release executed by the settlors and beneficiaries. There is nothing from which to infer that like instructions, instruments and accounts do or do not exist in the thousands of other trusts for which plaintiff would speak.

---

2. This is understandable from the common practice in the street in such cases. The selection of brokerage houses for such trivial transactions usually emanates from respective corporations involved.

It is self evident and not fairly deniable that there is enormous variety in the form and provisions of trust instruments, reflecting differences of objectives, manner of administration and governing law; the record so states. A significant number of the trusts are administered by one or more trustees with the defendant. On December 31, 1970, approximately fifteen hundred and fifty trusts had one co-trustee and approximately two hundred and seventy-five had at least two co-trustees with defendant. Those two thousand co-trustees live in 36 states, the District of Columbia and 14 foreign countries. The identity and number of co-trustees of some trusts have been altered during the period of administration of the trust. In some states, all co-trustees of a trust must join in each investment decision, whereas in others investments may be made by a majority of the trustees or directed by a beneficiary or outsider. Even when defendant is sole trustee, the variant trust instruments in some cases provide that someone else is to make investment decisions as was the case with certain of the revocable trusts established by the settlors in the case at bar.

■ Further complicating the differences of objectives and methods of administration, defendant's five thousand trusts differ from trust to trust as to the law governing the construction of the trust and the powers and responsibilities of the trustee. Usually testamentary trusts are governed by the law of the state where the testator was domiciled. Inter vivos trusts may specify the applicable law. In the instant trust of which the plaintiff is the beneficiary, New York's is the applicable law. External circumstances applicable to all trusts have changed substantially since many of the current trusts were established. The nature of the securities markets has also changed radically. As an example, the third market, to which the plaintiff makes reference, is a relatively new phenomenon and commissions on exchange transactions were non-negotiable until after this complaint was filed.

Because plaintiff has alleged a wrong which potentially harms a number of persons who are superficially "similarly situated", class action treatment becomes a *conceivable* mechanism for administration of the action. The class action is a sophisticated joinder device which Rule 23 states is justified under certain circumstances to avoid multiplicity of litigation, to avoid the risk of separate litigations producing inconsistent results for or against persons having the same relationship to their adversary, and to provide a mechanism for the efficient litigation of related claims.

However, the questions of law or fact common to the members of the class attempted to be created here do not predominate over questions affecting only individual members.

The charge in the complaint of poor executions and failure to use the third market seemingly will require a comparison of every transaction for every trust with other executions obtained at the same time and transactions, if any, made in the third market. To judge the further charge of excessive turnover, each transaction may have to be measured against the then current investment objectives of the particular trust. The further question raised by the complaint whether investments were made on the basis of inadequate investment advice again requires an examination of each transaction separately. Thus, in considering whether common questions predominate in measuring defendant's conduct of these transactions, it must be taken into account that in 1970 alone there were approximately sixty thousand transactions by defendants for approximately five thousand trusts.

To the factual and legal complexities presented by the issues of liability in each trust must be added the further variations in issues of damages. The theories on which plaintiff seeks damages for all members of her class will require the minute examination of the transactions undertaken in each portfolio. These issues would go substantially beyond "a mere matter of administering

a formula derived from the resolution of the issue of liability." *Cf*. Morris v. Burchard, 51 F.R.D. 530, 536 (S.D.N.Y. 1971).

■ A class action is not the best available method for the fair and efficient adjudication of the controversy. The best method for adjudicating the issues raised by plaintiff is in the normal trust accounting under the trust agreement sued on.

■ There is no particular need for the representative action as a device for vindicating claims against trustees of trusts. Traditionally, claims against trustees akin to these find expression in accounting proceedings conducted in the state courts. The claims, taken individually, are not too small to justify legitimate objections to the usual trustee's accounting—there is no need to group such claims. As a matter of public policy, matters of this kind should be left to the control of state legislatures, state courts and state administrative agencies where rules of fiduciary conduct are created and normally administered, subject to the individual desires and agreements of creators of trusts.

The key factor in any (b) (3) class action determination is that listed in Rule 23(b) (3) (D), an assessment of the difficulties likely to be encountered in the management of a class action.

Management of this case as a class action could create substantial and unnecessary difficulties. These would arise due to the factual and legal variations among defendant's trusts and their beneficiaries. The pretrial proceedings and then a trial on the varied fact and law questions would create substantial confusion for the Court, for the defendant and for members of the class.

Additionally, the problem of individual notice to the income beneficiaries and remaindermen of the modern day trusts presents enormous problems. Identification of the beneficiaries of a continuing personal trust while possible is often a massive task. Much more is involved than the mere examination of a trust instrument to disclose the names, let alone the locations, of the vested and contingent remaindermen. All these would reasonably be entitled to notice since they are more the interested parties than are the income beneficiaries by reason of the fact that the principal of the trust would probably be charged with the expenses or receive any damages.

In addition to the burdens of active participation in the pretrial aspects of such litigation, these potential class members face financial charges against their interests should their attack on the trustee not be completely successful. Even where the trustee's defense has been unsuccessful, Courts have sometimes held that if a trustee has acted reasonably and in good faith in connection with the activities out of which the litigation arose, it is entitled to reimbursement of expenses. *See* Chemical Bank and Trust Co. v. Ott, 248 App.Div. 406, 420–421, 289 N.Y.S. 228 (1st Dept. 1936), modified, 274 N.Y. 572, 10 N.E.2d 557 (1937); In re Wren, 21 Misc.2d 494, 499, 192 N.Y.S.2d, 441 (Sup.Ct.N.Y.Co.1959).

Clearly, actual individual notice to the interested beneficiaries is impractical and notice by publication is inadequate as a practical matter. Separate confidential relationships are involved in each trust which it may be against public interest to exploit in such litigation by an uninvited proponent. Indeed it is not uncommon for settlors of personal trusts to desire that remaindermen not be advised of their potential interests until those interests have vested.

Then too the members of the proposed class would under the law of averages include a substantial number of infants, incompetents and persons under other disabilities who do not have the capacity and in fact are not legally qualified to decide whether to participate in this proceeding or to opt out. Normally such interests would be represented in state court proceedings by appointed guardians or, in the case of charitable benefi-

ciaries, through the State Attorney General.

The class action determination which the plaintiff seeks in effect would, realistically, call for some five thousand accounting proceedings in a single action in one Court. To manage or effectively control them, would burden the Court's resources beyond its capacity.

■ From every aspect to be considered, it is undesirable to take from the state courts the administration of trusts —traditionally and efficiently controlled in those courts. The public interest is best served in that way; the obligations of trustees are determinable from the trust instrument appointing the trustee by Courts and personnel skilled in and accustomed to the management of such matters; separate confidential relationships involved in each trust which it may be against public interest to explore publicly are maintained in a proper perspective involving the directly interested parties alone. *See* Stevens v. Loomis, 223 F.Supp. 534, 538–539 (D.Mass.1963), aff'd, 334 F.2d 775 (1st Cir. 1964). Escalation of litigation by the use of Rule 23 should not be countenanced where the myriad fact and law issues should be tried in other Courts and may have to be anyway. A class action is patently inferior for the sound administration of justice in claims of this character.

The plaintiff characterizes the variations among trusts and beneficiaries mentioned by defendant as "labored heterogeneity". She believes that overriding all the variations is "reciprocity" between the trustee defendant and the suppliers of brokerage services for the trusts. The questioned services for the attempted class are those selected by the trustee. This emphasis, as already indicated, at once impairs the plaintiff's position as a representative of the class since by and large the selection of a broker was not made by the trustee for transactions in the plaintiff's trust.

Plaintiff views the "reciprocity" as an anti-competitive practise at which the anti-competitive practice at which the

anti-trust laws are aimed, "intruding into the choice among competing products . . . an irrelevant and alien factor", citing, FTC v. Consolidated Foods Corp., 380 U.S. 592, 594, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965).

It is unnecessary for present purposes to enter upon a consideration of the merits of the claims asserted in their various permutations and combinations.

The vigorous attack by the plaintiff on the alternatives to such a suit as this which are suggested by the defendant has distracted from and obscured somewhat the point to be decided on this motion.

No one questions that claims under the Exchange Act of 1934, under the Sherman Act and possibly also, under the Federal Reserve Act (if cognizable in a private civil suit), are claims within the exclusive federal jurisdiction. But that does not sufficiently answer the question whether such claims, at the instance of a trust beneficiary, should be litigated in a class manner or should be left to individual suit.

There seems to be little practical advantage to the particular litigant herself or excuse to employ federal statutes to repair the injury asserted. New trails will have to be blazed to sustain the federal notions for recovery. Traditional state law means, the state courts and even the state banking superintendent, could adequately administer a complaint of profiting in an express trust relationship.

No especial disadvantage to an injured individual from use of traditional means seems apparent, irrespective of whether the claimant is the holder of a small or large economic stake in the outcome. This Court is not in control of accountings for express trusts and does not undertake to supervise administration of such trusts.

The fact that defendant suggests the traditional and seemingly adequate means of administering claims based on breach of trust is referred to by plaintiff as a "cynical ploy" to move plaintiff

out of the federal court. To the contrary she may nonetheless remain and litigate the merits of her federal claims in the federal court and she may have the accouterment of a jury trial on proper jury issues, if those are her preferences as the means to set the trustee straight on its duties qua trustee and to attain her monetary relief.

Parenthetically, the notion of utilizing a jury trial in a class suit containing the varied problems certain to abound herein, is enough to chill any further discussion of the required superiority of a class claim over other available methods for the fair and efficient adjudication of the controversy. Such a trial, whether one trial or the multiple mini-trials probably required, would withdraw from all other usefulness for years to come the federal judicial personnel involved. Where one could muster jurors willing to devote themselves so indefinitely in time from their accustomed tasks, is puzzling. And one might relevantly ask —what public interest would be served by devoting the public's facilities in this way and what just purpose requires such a colossal marshalling of judicial resources and their supporting personnel?

If Rule 23 as applied can principally result only in *in terrorem* accomplishments as a practical solution to gargantuan litigation, it is high time for needed revision along lines of practicality and the facts of litigation life. It is time then to seek a fairer balancing of the public interests at stake in order to aid the acknowledged wards of the Courts, the holders of small economic stakes in the injuries pictured.

As far as this Court is aware, there are only isolated instances of the completion of actual trial of any class action litigation since the new Rules thereon went into effect.[3] The dramatic recoveries that have been achieved in class actions have not been the result of a test of the merits in the crucible of a trial. This anomaly suggests that litigation is not necessarily the fair and just method of administering injuries involving hordes of individuals with variegated individual claims or defenses. The subject matter is clearly one for a new look at the Rules or legislative investigation and concern. Another, better method of attaining the desired objectives should be sought—perhaps one to be administered by a public body in existence, federal or state administrative agencies, or by specially constituted tribunals.

Professor Milton Handler, a recognized scholar and authority, on class and anti-trust litigation has aptly expressed the view that:

> What one rarely encounters is a hardnosed appraisal of the actual effects of massive class actions on both courts and litigants. . . .
>
> Thus, as a matter of policy, class actions should not be allowed where the costs of administration, including attorneys' fees, are disproportionate to the probable benefits to individual class members and where the class action will put unmanageable burdens on the federal courts.

71 Col.L.Rev. 1, 6, 12 (1971)

In short, a class determination plainly is neither feasible nor indicated herein in the interests of justice, no matter how skillfully the semantic arguments therefor are arranged. The plaintiff's motion to utilize the class action device herein attempts to stretch a beneficial mode of litigation too far.[4]

While not strictly the same, the attempt of the plaintiff to include in her class not only beneficiaries of her own trust, but beneficiaries of separate and distinct trusts is akin to attempts by

---

3. Out of the flood of class cases, one of the exceptional trials reported is Siegel v. Chicken Delight, 271 F.Supp. 722 (N.D. Cal.1967) (class action determination), 311 F.Supp. 847 (N.D.Cal.1970), rev'd in part, 448 F.2d 43 (9th Cir. 1971).

4. Korn v. Franchard, 2 Cir., 1972, 456 F.2d 1206, involving a single written prospectus and a major charge of nondisclosure is not apposite to the facts or the case at bar.

shareholders of one corporation to sue on behalf of the shareholders of all other like corporations. Several attempts have been made to join as a class, shareholders of different mutual funds on federal claims bearing a similarity to those here asserted. These attempts have been turned back uniformly. Thus far the Courts have limited the equitable remedies of the individual plaintiff only to actions involving the economic unit with which he is associated. *Cf.* Kauffman v. Dreyfus Fund, Inc., 434 F.2d 727 (3rd Cir. 1970), cert. denied, 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971); Herman v. Steadman, 50 F.R.D. 488 (S.D. N.Y.1970); Weiner v. Winters, 50 F.R.D. 306 (S.D.N.Y.1970). Couched in holdings of these cases, the plaintiff herein lacks standing; her "class" extends only to all beneficiaries of her own trust apart from the further specific objection that here the asserted claim is not typical of the class the plaintiff would represent and apart from the other impediments to class suit indicated above.

It is of interest to note that the New York State courts have reacted to the spate of attempts at class action maintenance by construing the state statute, CPLR 1005 (a):

> to require the plaintiff to demonstrate as a condition precedent to a class suit not only that plaintiff has a cause of action, but that he is bound by a 'unity of interest' with other members of the alleged class. Identical contracts, contract provisions, or even identical wrongs are insufficient to support the necessary 'unity of interest' requirement (citing cases) . . . . Zachary v. R. H. Macy & Co., 66 Misc.2d 974, 977, 323 N.Y.S.2d 757, 760. (Sup. Ct. (N.Y.C.) 1971).

*See also* Bouton v. Van Buren, 229 N. Y. 17, 127 N.E. 477 (1920) which involved the right of the owner of a brokerage account on margin to sue for accounting on behalf of herself and other owners of accounts based on improper practices of the broker; Hall v. Coburn Corp. of America, 26 N.Y.2d 396, 311 N.Y.S.2d 281, 259 N.E.2d 720 (1970) which held in effect that a class action requires both a common interest and common facts among all members, viz., "This does not become a common question because the same finance company is the assignee of the contracts and prepared them for use by the contracting parties" 26 N.Y.2d at page 400, 311 N. Y.S.2d at p. 282, 259 N.E.2d at p. 721. The principle of those cases has been sharply criticized. See, Homburger, "State Class Actions and the Federal Rule, 71 Col.L.Rev. 609 (1971).

So too, maintenance of litigation for overextensive classes which make fair litigation unrealistic in scope, has similarly been refused: E. g., all consumers of bread in the Philadelphia area, Hackett v. General Host Corp., Civil No. 70–364 (E.D.Pa. August 18, 1970); all consumers of eggs in the United States, United Egg Producers v. Bauer Int'l Corp., 312 F.Supp. 319 (S.D.N.Y.1970) (McMahon, J.); all working women in Louisiana, Ward v. Luttrell, 292 F.Supp. 165 (E.D.La.1968).

The Court recognizes that there are countervailing arguments and conclusions to be drawn on the issue raised in this case. The resolution of the matter is not easy. The fundamental issue turns on the best means to serve the public interest without undue advantage or harm to the litigants involved and with due regard to the capacity of the tribunal to undertake the assigned tasks.

Giving due weight to the doctrine of employing liberality towards use of class litigation, nonetheless, in situations of the kind presented here, the ends of justice are better served by separate actions.

Plaintiff's motion to maintain this suit as a class action is in all respects denied.

Plaintiff's individual claim will be added to the Court's trial calendar to be tried in June, 1972. Submit a proposed pretrial order and requested instructions to the jury by May 15, 1972.